William Nelson
1523 132ND ST SE STE. C418
Everett, Washington 98208
425-645-9222 | 808-204-1401
william@seattleseahawks.me

HON. JUDGE DAVID G. ESTUDILLO

FILED _____ LODGED
_____ RECEIVED

JUL 08 2025

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT (TACOMA DIVISION)

WILLIAM NELSON,

      Plaintiff,

vs.

WASHINGTON BOARD OF INDUSTRIAL
INSURANCE APPEALS ET AL.

      Defendants.

Case No.: 3:25-cv-05551-DGE

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS**

**TO THE HONORABLE COURT:**

Pursuant to the Court's inherent authority to take judicial notice of legislative facts, and in accordance with established precedent recognizing that courts may notice "social, economic, and scientific facts" that inform legal reasoning and statutory interpretation, Movant respectfully requests this Court take judicial notice of the following legislative facts concerning systemic barriers faced by pro se litigants, particularly those with disabilities, in accessing equal justice under law.

      **I.    NATURE AND SCOPE OF REQUEST**

Unlike adjudicative facts governed by Federal Rule of Evidence 201, legislative facts "supply premises in the process of legal reasoning" and assist courts in interpreting statutes and constitutional provisions. Courts routinely take judicial notice of legislative facts without the strict evidentiary requirements applicable to adjudicative facts. These facts inform policy judgments and developments in constitutional law, as exemplified in landmark cases like *Brown v. Board of Education*.

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS - 1

The legislative facts presented herein are documented in detail in the comprehensive report attached hereto as **Exhibit A**, which provides extensive analysis, case citations, and empirical data supporting each factual assertion. The legislative facts demonstrate a systemic pattern of constitutional violations affecting millions of Americans who must navigate the court system without legal representation, with particularly severe impacts on individuals with disabilities.

## II. LEGISLATIVE FACTS WARRANTING JUDICIAL NOTICE

### A. The Fundamental Promise vs. Current Reality

- **FACT 1:** The United States Constitution guarantees equal protection of the laws (14th Amendment), due process (5th and 14th Amendments), and the right to petition government for redress of grievances (1st Amendment).

- **FACT 2:** The Supreme Court established over 50 years ago in *Haines v. Kerner* (1972) that pro se pleadings must be construed liberally and held to "less stringent standards" than lawyer-drafted pleadings, with allegations "however inartfully pleaded" not to be rejected if any set of facts could support success.

- **FACT 3:** As documented extensively in **Exhibit A**, despite these constitutional guarantees and judicial precedents, pro se litigants face systematic exclusion from meaningful court access through procedural barriers that function as modern equivalents to Jim Crow-era exclusionary devices.

### B. Empirical Evidence of Systemic Exclusion

- **FACT 4:** The empirical evidence detailed in **Exhibit A** demonstrates that pro se litigants experience dramatically lower success rates across all case types:
  - Only approximately 10% of unrepresented immigrants obtain favorable results in appeals, versus 40% of those with attorneys
  - 83% of petitioners with lawyers succeed in obtaining protective orders, compared to just 32% of pro se petitioners
  - Success rates for self-represented parties typically range from 10-30% across various case types

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS - 2

- **FACT 5:** As documented in **Exhibit A**, in some jurisdictions, one-quarter or more of civil cases involve a pro se party, yet meaningful access to justice has not improved commensurately with this surge in self-representation.

C. **Procedural Barriers as Modern "Literacy Tests"**

- **FACT 6:** **Exhibit A** provides comprehensive analysis showing that modern court procedures function as "legal literacy tests" that systematically exclude those without legal training, paralleling how Jim Crow-era literacy tests excluded Black citizens from voting while maintaining facial neutrality.

- **FACT 7:** As detailed in **Exhibit A**, the Supreme Court's decisions in *Twombly* (2007) and *Iqbal* (2009) created heightened pleading standards that "disproportionately harm pro se litigants" who lack resources to gather detailed pre-suit facts and may rely on generic forms or layperson language.

- **FACT 8:** The case law analysis in **Exhibit A** demonstrates that courts regularly dismiss pro se cases for technical deficiencies rather than substantive merit, as exemplified in *Chronis v. United States* (7th Cir. 2019), where Judge Rovner noted that rigid procedural demands allow "the sophisticated steam shovel [of bureaucracy to roll] right over" pro se plaintiffs who cannot afford lawyers.

D. **Institutional Bias and Judicial Attitudes**

- **FACT 9:** As documented in **Exhibit A**, retired Seventh Circuit Judge Richard Posner publicly acknowledged that "most judges regard [pro se litigants] as kind of trash – not worth the time of a federal judge," revealing widespread institutional bias within the judiciary.

- **FACT 10:** **Exhibit A** details how Judge Posner became so troubled by the treatment of pro se appellants that he resigned from the bench in protest and attempted to establish a legal assistance project, which he ultimately shut down due to overwhelming need and lack of systemic support.

- **FACT 11:** The institutional analysis in **Exhibit A** shows that the current system creates perverse incentives for courts to dispose of pro se cases on technical grounds rather than invest time in substantive hearings, as "writing a short order citing a procedural defect is far easier than conducting a full hearing or trial with a confused self-represented party."

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS - 3

E. **Compounded Barriers for Disabled Litigants**

- **FACT 12:** As extensively documented in **Exhibit A**, despite the Americans with Disabilities Act being in effect for over 30 years, people with disabilities face additional systematic barriers in court access, including physical inaccessibility, communication barriers, and attitudinal bias.

- **FACT 13:** The empirical research detailed in **Exhibit A** includes a 2015 survey of New York City courthouses that found "numerous accessibility problems at every single courthouse visited," forcing disabled individuals to use stigmatizing workarounds like freight elevators and back entrances.

- **FACT 14: Exhibit A** documents that the U.S. Department of Justice has found that people with disabilities "face stigma as they interact with justice system actors who question their credibility, their ability to make decisions in their legal matters, and whether they deserve redress for harms they have experienced."

- **FACT 15:** As detailed in **Exhibit A**, during the COVID-19 pandemic, less than 3% of over 10,000 emergency court orders reviewed contained information on accessibility or accommodation requests for virtual proceedings, effectively excluding many disabled people from remote hearings.

F. **Constitutional Violations and Systemic Inertia**

- **FACT 16:** The constitutional analysis in **Exhibit A** demonstrates that the current system creates a class of persons who have constitutional rights on paper but no realistic avenue to enforce them, violating fundamental principles of due process and equal protection.

- **FACT 17:** As documented in **Exhibit A**, pro se litigants lack political power and organized influence over procedural rules, which are largely written by committees of lawyers and judges, creating a system where those most affected by barriers have no voice in reform.

- **FACT 18: Exhibit A** provides evidence that the judiciary's institutional resistance to reform is exemplified by the isolation and eventual resignation of judges like Richard Posner who advocate for pro se litigants, sending a message that "rocking the boat" on this issue is unwelcome.

\\
\\
\\

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS - 4

### III. LEGAL SIGNIFICANCE OF THESE FACTS

These legislative facts demonstrate that facially neutral procedural rules operate to systematically exclude vulnerable populations from court access, creating a two-tiered justice system that violates constitutional guarantees. As detailed in the comprehensive analysis in **Exhibit A**, this parallels the Jim Crow era, where ostensibly race-neutral rules like literacy tests were upheld in cases like *Williams v. Mississippi* (1898) despite their exclusionary purpose and effect. Current procedural rules maintain the appearance of equality while denying substantive access to justice.

The pattern revealed by these facts shows that:

1. **Due Process violations** occur when procedural complexity makes meaningful court access impossible for those without legal training
2. **Equal Protection violations** result from systematic disparate treatment of pro se litigants
3. **First Amendment violations** occur when the right to petition for redress becomes illusory due to insurmountable procedural barriers
4. **ADA violations** compound these constitutional harms for disabled litigants

### IV. SUPPORTING DOCUMENTATION

The legislative facts presented herein are comprehensively documented in the report attached as **Exhibit A**, which contains:

- **Detailed analysis** of over 50 years of systemic barriers facing pro se litigants
- **Extensive case law citations** and judicial opinions demonstrating institutional bias
- **Empirical studies** on pro se litigation outcomes across multiple jurisdictions
- **Documentation of ADA compliance failures** in court systems nationwide
- **Constitutional analysis** of due process and equal protection violations
- **Historical parallels** to Jim Crow-era exclusionary practices
- **Comprehensive references** to government reports, academic studies, and documented institutional practices

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS - 5

This Court may rely upon **Exhibit A** as authoritative documentation of the legislative facts presented, as it represents a thorough compilation of publicly available judicial decisions, government reports, academic studies, and documented institutional practices that establish the systemic nature of barriers facing pro se litigants and disabled court users.

## V.     CONCLUSION

These legislative facts establish that the current court system operates as a "closed door disguised as an open one" for millions of Americans. Recognition of these facts is essential for informed judicial decision-making regarding procedural rules, accommodation requirements, and constitutional obligations to ensure meaningful access to justice.

The Court's acknowledgment of these realities through judicial notice would serve the same function as the Supreme Court's recognition in *Brown v. Board* that separate educational systems were inherently unequal – providing the factual foundation necessary for constitutional analysis and potential reform.

As comprehensively documented in **Exhibit A**, the evidence demonstrates that:

- **Millions of Americans** are effectively denied constitutional rights through systemic procedural barriers
- **Disabled litigants** face compounded exclusion despite three decades of ADA protections
- **Institutional bias** within the judiciary perpetuates these barriers
- **Constitutional violations** occur daily through denial of due process, equal protection, and petition rights
- **Reform efforts** have been systematically thwarted by judicial resistance and lack of political power among affected populations

**WHEREFORE**, Movant respectfully requests this Court take judicial notice of the foregoing legislative facts as established social, economic, and legal realities that inform the constitutional and statutory issues before this Court, and further requests that this Court consider the comprehensive documentation provided in **Exhibit A** as authoritative support for these legislative facts.

\\

\\

\\

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE FACTS - 6

Respectfully submitted 3 July 2025

*[signature]*

**William Nelson, Pro Se**
1523 132ND ST SE. STE C418
Everett, Wa 98208
(425) 645-9222 (desk)
(425) 800-8800 (mobile)
(808) 204-1401 (fax)
william@seattleseahawks.me (email)

# Inaccessible Justice: Pro Se Litigants, Disabilities, and Modern Jim Crow Barriers in the Courts

## Equal Access to Courts – Ideals vs. Reality

American law has long professed a fundamental commitment to equal access to the courts, regardless of wealth or status. The Founders believed that the ability to represent oneself in court was *"a basic right of a free people,"* and early American legal regimes fiercely guarded the right to proceed **pro se** (without a lawyer) as a reflection of egalitarian and democratic ideals. In theory, no one should be denied a forum to air grievances simply because they cannot afford counsel – otherwise the right of access becomes merely a privilege for the few. Consistent with this principle, all U.S. jurisdictions permit self-representation, and the Supreme Court held over 50 years ago that *pro se* pleadings must be construed **liberally** and held to **"less stringent standards"** than lawyer-drafted pleadings. In *Haines v. Kerner* (1972), the Court reversed a summary dismissal of a prisoner's *pro se* complaint, emphasizing that an unrepresented litigant's allegations, *"however inartfully pleaded,"* should not be rejected if there is any set of facts under which they could succeed. This was meant to ensure that procedural technicalities do not bar justice for those without legal assistance.

In **practice**, however, the promise of equal access under law has steadily ringed hollow for large segments of the populace who must navigate the courts *pro se*. Over the last 50 years, the number of self-represented litigants has surged (in some jurisdictions, **one-quarter or more** of civil cases involve a pro se party), but meaningful access to justice for them has not improved commensurately. **Modern litigation is highly complex**, and despite the nominal right to self-representation, *pro se* individuals face a maze of procedural rules, technical requirements, and unwritten norms that effectively shut them out of court. As one appellate judge observed, *"modern litigation contains so many traps and barriers that it is near to impossible for non-lawyers to successfully navigate it."* Even as courts profess neutrality, this **labyrinth of procedural technicalities** means that those without legal training are frequently tripped up on filing formats, jurisdictional nuances, deadlines, and evidentiary rules that lawyers handle as a matter of routine. The result is that many *pro se* cases never get decided on their merits – they are dismissed or derailed due to technical defects and procedural missteps. In short, **those without money or lawyers often find themselves "simply unprotected by the law, even when technically it is on their side."**

# Procedural Barriers and "Technicalities" That Thwart Pro Se Litigants

Unlike a represented party, a person proceeding *pro se* must single-handedly perform all the functions of an attorney – drafting pleadings in the correct legal form, citing the right statutes or case law, meeting discovery and motion practice requirements, and following arcane court rules. These rules are ostensibly applied equally to all parties, but in effect they pose **immense hurdles** for laypersons. Judges may give *pro se* litigants some leeway, but there is a limit to such leniency, and many courts hold even unrepresented plaintiffs strictly to procedural rules. In recent decades, the **barriers have arguably grown higher**. In 2007 and 2009, the Supreme Court's *Twombly* and *Iqbal* decisions tightened the standard for pleading a case in federal court, requiring plaintiffs to state "plausible" claims with factual specificity. Scholars have noted that this new **plausibility pleading** rule *"disproportionately harms pro se litigants"*, who often lack the resources to gather detailed facts pre-suit and may rely on generic forms or layperson wording. Under these heightened standards, even a liberally construed *pro se* complaint is more likely to be dismissed as "conclusory" or implausible. The intent of the Federal Rules was to keep the courthouse door open – a *"short and plain statement"* of a claim was supposed to suffice – yet today a meritorious claim can fail if the self-represented plaintiff does not know the *"magic words"* or exact formatting the court expects.

Indeed, case law is replete with examples of *pro se* litigants losing because of procedural technicalities rather than lack of substantive merit. For example, in **Chronis v. United States (7th Cir. 2019)**, a woman without a lawyer tried diligently to pursue a small medical malpractice claim through every proper channel. She *did* file complaints and even wrote to the appropriate federal agency – but because her letter did not use the precise legal phrasing ("sum certain") required by the Federal Tort Claims Act, her case was thrown out. In dissent, Judge Rovner lamented that after Chronis's *"valiant and persistent efforts,"* the court still faulted her for failing to say *"the magic words in the correct format and in the correct place,"* allowing *"the sophisticated steam shovel [of bureaucracy to roll] right over her, as it will other injured pro se plaintiffs who cannot afford to hire lawyers to recover small sums."* In other words, **even plaintiffs with valid rights can be steamrolled by the system if they miss a procedural step**. Modern courts often insist on *strict compliance* with rules that laypeople have no way of knowing – a situation comparable to requiring an untrained person to perform surgery on themselves and then denying relief if they make a technical mistake.

Compounding these hurdles is the **lack of effective guidance**. Court clerks can give basic information but generally cannot provide legal advice. Few jurisdictions have sufficient self-help clinics or navigators. Many *pro se* litigants – especially those with limited education or English proficiency – struggle to even understand the forms and legal language. The unavoidable reality is that **outcomes differ drastically for those with counsel versus those without**. Empirical studies consistently show that *pro se* litigants win far less often than represented ones. For instance, in U.S. immigration appeals, only about **10%** of unrepresented immigrants obtained a favorable result, versus around **40%** of those who had attorneys (even when the attorneys were working pro bono). In one study of domestic violence protective order cases, **83%** of petitioners with a lawyer succeeded in obtaining the order, compared to just **32%** of *pro se* petitioners.

Across many case types, the estimated success rate for self-represented parties is often in the **10–30%** range, far lower than for those with legal representation. Such disparities confirm that *pro se* litigants as a group are **at a severe disadvantage** in vindicating their rights.

The cumulative effect of these procedural obstacles is to make the **courts essentially inaccessible to many Americans**, despite the formal right to be heard. When someone without means tries to *"plainly redress the court"* – i.e. simply tell their story and seek justice – they are met with a thicket of procedural snares. If a filing is on the wrong paper size or misses a certificate of service, it may be rejected. If a claim is filed in the wrong venue or the wrong format, it may be dismissed *"without prejudice"* (legalese for *"start over and get it right next time"* – an option many *pro se* litigants cannot afford or manage). In theory, judges should guide *pro se* parties or relax minor rules in the interest of justice; in practice, that is inconsistent and limited. As Judge Ilana Rovner starkly put it, under today's conditions *"few, if any, lawyers would take a civil action to recover $332"* (the small sum at issue in Chronis), so the plaintiff *"had no choice but to seek a remedy on her own"* – yet the court's rigid approach meant that if **she** couldn't navigate the hoops, *"what pro se plaintiff would ever succeed?"*.

## Judicial Bias and Dismissive Attitudes Toward Pro Se Litigants

Not only do *pro se* litigants face structural barriers, but they also encounter the **intangible barrier of prejudice or skepticism** from those in the system. Many judges and court staff, overwhelmed with busy dockets, view *pro se* cases as a headache – often assuming these filings are meritless, incoherent, or "frivolous." This institutional bias has been candidly acknowledged by insiders. Famed appellate judge Richard Posner (of the Seventh Circuit) bluntly observed upon retiring that *"most judges regard [pro se litigants] as kind of trash – not worth the time of a federal judge."* This striking statement (reported in a 2017 interview and echoed in the ABA Journal) reveals the contemptuous attitude he witnessed among his colleagues. Posner himself became so troubled by how *pro se* appellants were treated as *"shabby"* or second-class that he quit the bench in protest, calling attention to the problem. He even founded a legal assistance project for *pro se* litigants post-retirement – only to shut it down shortly thereafter, citing the overwhelming volume of people in need and the lack of broader support for the effort.

While not every judge would use such harsh language, the **pervasive sentiment** in many courthouses is that *pro se* cases are a nuisance. Judges may feel that *pro se* litigants expect *"special treatment"* or use up scarce judicial resources. Even well-meaning judges can fall prey to unconscious bias – for example, being less patient with a disorganized self-represented litigant than they would be with a polished attorney, or giving more credence to a lawyer's arguments than to a layperson's. This bias can manifest in subtle ways: a judge might cut off a *pro se* litigant's oral argument, refuse to grant extensions or latitude that attorneys routinely receive, or simply be quicker to dismiss *pro se* filings as *"non-compliant"* or lacking merit. The **data on outcomes** reflect this imbalance. As noted, success rates for *pro se* parties are abysmal in many contexts, which likely cannot be explained by merit alone. In practice, **"those without money are simply unprotected by the law"** despite formal equality. When judges approach *pro se* claims with a predisposition that they are *"trash"* or not worth much time, it becomes a self-

fulfilling prophecy that such cases will be handled perfunctorily and end poorly for the unrepresented party.

This systemic dismissiveness toward *pro se* litigants is reminiscent of how certain classes of people were treated under openly discriminatory regimes. **They are effectively being told that their grievances are not important, or not *presented* in the *proper* way, and thus can be ignored.** Such an attitude violates the spirit of judicial impartiality and equal protection. As one legal commentary put it, access to justice should not be contingent on having the **"right"** credentials (like a law degree or bar license); otherwise **the fundamental right to be heard becomes "a mere privilege denied to certain segments of society."** Unfortunately, for *pro se* litigants today, that privilege is often denied in fact. Even though courts nominally allow self-representation, the unspoken message many get is: *"Don't bother coming without a lawyer – you'll be lost, and we won't really listen."*

Perhaps most troubling, *pro se* litigants as a class have **no effective voice or leverage to change this dynamic**. They are, almost by definition, outsiders to the system – lacking representation in both the courtroom and in the policy debates about court reform. They do not have lobbying power or organized influence over the rules of procedure (which are largely written by committees of lawyers and judges). When their cases are dismissed or mishandled, they often do not have the knowledge or resources to appeal, and complaints about unfair treatment are easily brushed aside. In theory, the Constitution's guarantees of Due Process and Equal Protection should apply to *pro se* litigants – the Fourteenth Amendment does not distinguish between those with attorneys and those without. In **Gideon v. Wainwright** (1963) the Supreme Court recognized the right to counsel in criminal cases, precisely because a fair trial is impossible for most laypeople unassisted. Yet in civil matters (where no such right to free counsel exists), we effectively condition the ability to vindicate one's rights on one's ability to hire a lawyer. This contravenes the *"fundamental precept"* that **financial status must not determine outcomes or access to justice**. As one law review article noted, if we require ordinary citizens to have expert legal help to be heard, we are denying a huge portion of the populace the equal protection of the laws and the right to petition government for redress.

# Continuation of Jim Crow–Type Barriers in a Modern Guise

The situation faced by *pro se* litigants today echoes, in important ways, the injustices of the Jim Crow era. During Jim Crow (roughly late 19th to mid-20th century), the law **ostensibly** promised rights to all – after the Civil War, the Reconstruction Amendments guaranteed due process and equal protection (14th Amendment) and voting rights regardless of race (15th Amendment). However, those promises were systematically **undermined by barriers and technical rules** devised to disenfranchise and marginalize Black Americans. Southern states, for example, imposed **poll taxes, literacy tests, and other ostensibly "neutral" requirements** that in practice prevented Black citizens from voting or serving on juries, while often allowing poor whites to escape those rules via loopholes like grandfather clauses. These measures created a *"black hole"* in which the rights existed on paper but vanished in reality for the targeted group. The courts and government officials of that era frequently went along with this facade. In **Williams v. Mississippi (1898)**, the U.S. Supreme Court infamously upheld Mississippi's poll tax and literacy test requirements on the grounds that they *appeared* race-neutral – the state

constitution *"didn't discriminate between the races"* on its face – and *"it has been shown that their actual administration wasn't evil: only that evil was possible under them."* Of course, in truth those laws were deliberately crafted to exclude Black voters, and the "possibility" of evil was the very **purpose**. The Williams decision gave judicial sanction to a regime where **facially equal rules masked grossly unequal realities.**

A similar dynamic is at work in how courts handle *pro se* litigants. The **rules of civil procedure, court deadlines, formatting requirements, fee requirements, and so on are facially neutral** – they apply to everyone, *"rich or poor, lawyer or layman."* But in effect, these rules disproportionately **punish the poor, the untrained, and the disabled**, much as literacy tests and other Jim Crow rules punished formerly enslaved people and their descendants under a veneer of equal application. Modern court procedures have become a kind of **"legal literacy test."** If you cannot parse the language of pleadings, or fail to interpret a court rule correctly, you flunk – and your case is thrown out, just as Black voters "failed" arbitrarily administered literacy exams and were turned away at the polls. The promise of *"equal justice under law"* emblazoned on courthouse pediments is, for *pro se* litigants, too often an empty slogan. As one appellate judge observed in 2019, under current practices only a *"seriously legally skilled poor person"* has any realistic chance of navigating the system and having their claim adjudicated on the merits. In other words, the courts have unintentionally (or perhaps through inertia) **created a parallel to the Jim Crow situation**: rights are nominally available to all, but a host of procedural obstacles and institutional biases ensure that a disfavored class (here, the self-represented and especially those among them who are indigent or disabled) cannot effectively exercise those rights.

The analogy to Jim Crow is not made lightly. Of course, the historical evils of de jure racial segregation were unique and far-reaching. But the *pattern* is instructive: **when those in power design systems without regard to the needs of marginalized groups, the result is exclusion**, even if the rules are ostensibly colorblind or neutral. Jim Crow-era officials defended their literacy tests and procedural hurdles by saying, *"Oh, the law is the same for everyone – we're just enforcing standards."* Today, one hears similar refrains in defense of rigid procedure: *"We can't bend the rules for people just because they don't have lawyers; that would be unfair to the other side."* On the surface, it sounds like an appeal to fairness and equality – one rule for all. But underneath, it ignores **equity** and real-world disadvantages. Treating unequals exactly the same can perpetuate inequality. In the Jim Crow context, the Supreme Court eventually recognized this in contexts like voting (e.g. *Guinn v. United States* (1915) struck down grandfather clauses, and the Voting Rights Act of 1965 finally banned literacy tests and other devices). In the *pro se* context, however, the courts themselves have been slow to reform their own processes. Procedural rules and norms that **all but require a law degree** to navigate remain firmly in place. The result is a de facto **"two-tiered"** justice system: one tier for those who can afford lawyers (or whose cases attract pro bono counsel), and a second, largely inaccessible tier for those who must go it alone.

# Additional Challenges for Litigants with Disabilities

For *pro se* litigants who also have disabilities, the barriers are **even more pronounced** – making this a uniquely disadvantaged subgroup effectively denied meaningful access to the courts. People with disabilities not only face all the hurdles discussed above, but also must overcome **physical, communication, and attitudinal obstacles** that the court system often fails to adequately address. Despite the Americans with Disabilities Act (**ADA**) being in effect for over 30 years, many courts are still ill-prepared to accommodate disabled litigants in practice, especially those appearing *pro se*. This leads to situations that are both **humiliating and justice-denying**.

Consider physical access: courthouses, particularly older ones, can be **literal obstacle courses** for individuals with mobility impairments. A 2015 survey of New York City courthouses found *"numerous accessibility problems at every single courthouse visited."* In many instances, the only way a wheelchair user could reach a courtroom or clerk's office was through a back door or freight elevator, or by asking staff to unlock barriers. These ad hoc workarounds often *"negatively draw attention to [the person's] disability."* For example, a wheelchair user might have to interrupt court proceedings to ask someone to move furniture because there is no wheelchair seating area, or wait alone in a loading dock for a staff member to operate an old elevator. **Such "accommodations" are stigmatizing and degrading** – as disability rights advocates note, they force people to choose between *"creating a commotion and drawing attention to themselves or not participating at all."*. The anxiety of appearing in court is heightened for a person with a disability when they must fight just to enter or be seen as an equal in the courtroom space.

Communication and procedural accessibility are another major problem. Court processes rely heavily on paperwork, dense text, and fast-paced oral exchanges – all of which can exclude those with hearing, visual, cognitive, or mental health disabilities. For instance, court websites and electronic filing systems may not be screen-reader compatible for blind users. Judges sometimes speak quickly or use legal jargon that a person with an intellectual disability cannot readily understand. Sign language interpreters or CART (real-time captioning) services for Deaf litigants are not uniformly provided, especially in minor civil matters; one study noted a dearth of "Deaf-friendly" services in domestic violence courts across the country. During the COVID-19 pandemic, when courts shifted to virtual hearings, **less than 3%** of over 10,000 emergency court orders reviewed contained any information on accessibility or how to request accommodations for the virtual format – meaning many disabled people were effectively shut out of remote proceedings. Even printed notices and forms are seldom in plain language or available in Braille/large print, posing yet more barriers.

Perhaps the most pernicious barrier for disabled litigants is the **attitudinal bias** they encounter. If *pro se* litigants in general face skepticism, those with obvious disabilities (or who disclose hidden disabilities) may face *doubts about their credibility or capacity* on top of that. The U.S. Department of Justice recently observed that people with disabilities *"face stigma as they interact with justice system actors who question their credibility, their ability to make decisions in their legal matters, and whether they deserve redress for harms they have experienced."* In other words, a disabled person seeking justice may not be taken as seriously – a Deaf person's

testimony might be unconsciously discounted because of how it's communicated, or a person with a mental health condition might be seen as less reliable. This **extra layer of prejudice** means disabled litigants often have to *prove* their competence or worthiness in a way that others do not.

Ironically, when disabled individuals seek formal accommodations from the court, the process itself can be burdensome and invasive. Under Title II of the ADA, courts must provide *reasonable accommodations* to ensure equal access. But in practice, **requesting accommodations may force a litigant to divulge private medical information and endure a slow, uncertain process** – all while their case deadlines are ticking. Many courts have no standardized, confidential procedure for ADA requests, resulting in disabled litigants having to file motions (visible to the other party) outlining intimate details of their condition in order to justify, say, a short continuance or permission to appear by telephone. This is *humiliating* for the individual and fundamentally at odds with privacy and dignity. Even when accommodations are granted, they may be inadequate or come with strings attached. For example, a litigant with PTSD or ADHD might request frequent breaks and a support person present – but the court might only allow one or neither, or a judge might openly question the need, causing the person to feel exposed and embarrassed. One attorney-advocate recounted a case where her client with ADHD struggled during testimony, appearing unfocused and evasive, which led the judge (unaware of her disability) to discredit her – an outcome that *could have been avoided* with simple accommodations like clarifying questions in writing or taking scheduled breaks. The client not only lost a fair share of assets but also felt *"intense humiliation"* and trauma from the experience.

Although the ADA and state laws **nominally protect disabled court users**, there is a stark gap between law and reality – **much as there was during Jim Crow** between the written civil rights amendments and on-the-ground enforcement. The ADA's promise of *"equal access to justice"* often falls short because courts fail to proactively implement inclusive practices. Some jurisdictions have made laudable efforts – for instance, the state of Washington adopted a rule (General Rule 33) explicitly allowing judges to appoint counsel as an accommodation for a person with a disability when necessary to ensure access to the court process. This recognizes that in some cases, the only meaningful accommodation for a severely disabled pro se litigant is to provide them an attorney to navigate the system. However, such measures are the exception rather than the norm. Many disabled individuals who cannot afford lawyers are **still denied any appointed counsel** in civil matters, and GR 33-style rules are not widespread. Even when accommodations are granted, they are often *"too little, too late"*. In short, disabled pro se litigants continue to face what amounts to a **double burden**: the systemic barriers confronting all self-represented persons, and additional hurdles due to physical and mental impairments – all of which combine to effectively deny them *due process* and *equal protection* in the courts.

# Constitutional Implications and the Lack of Incentive for Reform

The cumulative picture painted by these facts is **deeply troubling** from a constitutional perspective. The Fourteenth Amendment guarantees *"equal protection of the laws"* and that no person shall be deprived of life, liberty, or property without *"due process of law."* Furthermore, the First Amendment protects the right *"to petition the Government for a redress of grievances,"* which has long been understood to encompass access to the courts. When *pro se* and disabled litigants are systematically shut out, one can argue that these constitutional promises are being violated **every day**. We have effectively created a class of persons who have rights on paper but **no realistic avenue** to enforce them – a class of people for whom the courts are open in theory but closed in practice. This calls to mind the observation of civil rights advocates that *"justice too long delayed is justice denied."* Here, justice is not just delayed; it is *never obtainable* in the first place unless one can clear hurdles that many cannot. In a very real sense, **our courts are failing their constitutional duty** to provide equal justice. A fundamental tenet of the rule of law is that courts are **open to all** who seek a legal remedy for wrongs – yet if a person without means or with a disability finds that door effectively barred, their **due process rights are illusory**.

Why has this problem persisted so long, and why is there so little impetus within the judicial system to change it? One reason is that **those bearing the brunt of the problem – pro se litigants – lack political power and visibility**. They are not a well-organized interest group; many suffer in silence or give up on the system entirely. Meanwhile, those within the system (judges, lawyers) may not feel a strong incentive to push for reforms that would require extra work or upheaval. Accommodating *pro se* litigants and disabled litigants **means extra effort**: simplifying forms, allowing more leeway in procedure, spending more time explaining things in court, possibly providing counsel or stand-by assistance at the court's expense, etc. For overburdened courts, this is often seen as too costly or time-consuming. Indeed, some judges openly worry that being too welcoming to *pro se* claimants will **encourage a flood of litigants**, including frivolous cases, which could overwhelm the docket. There is a entrenched mindset that *pro se* litigants are *"taking up time that could be spent on real cases,"* and thus efficiency dictates pushing their cases out of the system quickly. This bureaucratic self-interest – avoiding more work, keeping caseload statistics manageable – creates a perverse **incentive to dispose of pro se cases on technical grounds** whenever possible, rather than invest the time to hear them out. After all, writing a short order citing a procedural defect is far easier than conducting a full hearing or trial with a confused self-represented party.

Additionally, judges who do try to assist *pro se* litigants or level the playing field may face subtle (or not so subtle) **pushback from peers and higher courts**. The case of Judge Posner is illustrative: his outspoken advocacy for *pro se* appellants was met with disagreement and even reproach from his colleagues. The chief judge of his circuit publicly disagreed with his critiques, and Posner felt sufficiently isolated that he resigned. While this is an extreme example, it sends a message within the judiciary that *"rocking the boat"* on this issue is not welcome. A judge who bends the rules to accommodate a *pro se* party risks being overturned on appeal for not strictly applying the law, or may be accused of **bias** in favor of one side. Many judges, consciously or not, prefer to stick to standard procedure and not *"open the floodgates"*. In short, there is **little**

**accountability or incentive** for courts to change their treatment of *pro se* litigants. Unlike in the legislative or executive branches, where public pressure and political movements can force change (as the civil rights movement did to end Jim Crow laws), the judiciary is insulated. Reform would have to come from within (through revised rules, judicial education, etc.) or from top-down mandates (e.g. Supreme Court rulings or legislation imposing duties on courts). So far, neither has sufficiently occurred. The Supreme Court in *Turner v. Rogers* (2011) acknowledged that trial judges should provide basic safeguards for unrepresented defendants (in that case, a civil contempt proceeding) to ensure fairness, but this was a narrow ruling and far from a comprehensive fix. No broad "Civil Gideon" (right to counsel in civil cases) has been recognized at the federal level, and Congress has not stepped in to guarantee counsel or simplify procedures either. In fact, funding for legal aid (which helps some *pro se* would-be litigants) has always been woefully low, meeting only a fraction of the need.

The end result is a kind of **systemic inertia**. The courts continue "business as usual," which means *pro se* and disabled individuals continue to be marginalized and denied justice, but there is no strong internal push to alter course. Doing the right thing by these litigants – whether that means appointing counsel more often, allowing more flexible procedures, or even just according their claims more patient attention – does not happen because it *"creates more work"* or could invite criticism that a judge is coddling litigants who *"don't follow the rules."* The path of least resistance is to maintain the status quo, even if that status quo is denying constitutional rights in substance.

# Conclusion

For at least the past half-century, American courts have **fallen short** of the ideal of equal justice when it comes to self-represented litigants and particularly those with disabilities. The lofty guarantees of the Constitution and the accessibility mandates of laws like the ADA have not been fulfilled on the ground. Instead, we have a parallel to a *"Jim Crow"*-type regime in our justice system – one where facially neutral rules and procedures operate to exclude and dispossess a vulnerable class of people, where the form of due process exists without the substance. *Pro se* litigants and disabled litigants find themselves in a **"black hole"** of procedural dismissals and denials, effectively stripped of the rights that courts are supposed to safeguard. This is not a problem affecting only a tiny fringe; studies show huge numbers of Americans will face civil legal issues without counsel (housing, family law, consumer issues, etc.), and in the status quo many will *never obtain relief* or even a fair hearing. Every day that this continues is a day of constitutional promise unkept – a quiet crisis in our courts that has persisted in the shadows.

It is imperative to recognize these realities as *legislative facts* worthy of judicial notice. Courts should not be able to pretend that *pro se* litigants have genuine, equal access when all evidence shows otherwise. Acknowledging the truth is the first step toward change. The judiciary must confront the fact that **procedural justice** is not being delivered equally: that to accord truly *"equal protection,"* courts may need to **treat the disadvantaged differently** (with accommodations and flexibility) rather than hide behind formal equal-treatment rules that yield unequal outcomes. The words etched on courthouse walls – *"Equal Justice Under Law"* – demand that we do better. Until the day comes when a person's ability to obtain justice does not

depend on their ability to hire a lawyer or navigate a legal maze, the courts will continue to perpetuate a quiet form of injustice. The Constitution is not self-executing; it falls upon the courts, of all institutions, to breathe life into its guarantees. Right now, for millions of unrepresented and disabled Americans, the courts are failing in that role. This stark reality must be faced and remedied, lest our justice system continue to operate as a closed door disguised as an open one.

# References

1. Judge Ilana Rovner dissenting in *Chronis v. United States*, 932 F.3d 544 (7th Cir. 2019) – noting the *"traps and barriers"* of modern litigation and describing how rigid procedural demands steamrolled a *pro se* litigant's valid claim.

   https://law.justia.com/cases/federal/appellate-courts/ca7/17-3093/17-3093-2019-07-29.html#:~:text=strates%20all%20too%20well%2C%20modern,not%20lost%20for%20Chronis%2C%20as

   https://law.justia.com/cases/federal/appellate-courts/ca7/17-3093/17-3093-2019-07-29.html#:~:text=not%20state%20that%20she%20sought,3d%20at%20924%20%28stringent%20application

2. Nathan J. Robinson, "Why Amy Coney Barrett Should Not Be on the Supreme Court," *Current Affairs* (Sept. 2020) – discussing Judge Barrett's record on *pro se* cases and quoting Judge Richard Posner: *"most judges regard [pro se litigants] as kind of trash not worth the time of a federal judge."* The article also highlights how *"those without money are simply unprotected by the law"* under current procedures.

   https://www.currentaffairs.org/news/2020/09/why-amy-coney-barrett-should-not-be-on-the-supreme-court#:~:text=Judge%20Richard%20Posner%2C%20who%20also,simply%20too%20many%20people%20in

   https://www.currentaffairs.org/news/2020/09/why-amy-coney-barrett-should-not-be-on-the-supreme-court#:~:text=se%20plaintiffs%20who%20cannot%20afford,lawyers%20to%20recover%20small%20sums

3. Debra Cassens Weiss, "Posner: Most judges regard pro se litigants as 'kind of trash'," *ABA Journal* (Sept. 11, 2017) – reporting Posner's remarks upon retirement that many judges treat *pro se* litigants with contempt.

   https://www.currentaffairs.org/news/2020/09/why-amy-coney-barrett-should-not-be-on-the-supreme-court#:~:text=Judge%20Richard%20Posner%2C%20who%20also,simply%20too%20many%20people%20in

4. Alexander A. Reinert, "Illiberal Construction of Pro Se Pleadings," 159 U. Pa. L. Rev. 585 (2011) – examining how procedural standards (especially after *Twombly/Iqbal*) disadvantage *pro se* litigants. Affirms that *"financial status should neither determine access to courts nor substantially alter the outcomes of cases,"* and that making access contingent on counsel turns a right into a privilege for the few.

   https://law-journals-books.vlex.com/vid/illiberal-construction-of-pro-634978037#:~:text=First%2C%20a%20fundamental%20precept%20of,all%20types%20to%20have%20their

   https://law-journals-books.vlex.com/vid/illiberal-construction-of-pro-634978037#:~:text=modern%20civil%20legal%20system%27s%20emphasis,Federal%20Rules%20of%20Civil%20Procedure

5. *Haines v. Kerner*, 404 U.S. 519 (1972) – U.S. Supreme Court per curiam opinion holding that a *pro se* prisoner's complaint could not be dismissed for technical pleading deficiencies. The Court stated that allegations of a *pro se* complaint, *"however inartfully pleaded,"* are to be held to *"less stringent standards than formal pleadings drafted by lawyers."*

   https://caselaw.findlaw.com/court/us-supreme-court/404/519.html#:~:text=however%20inartfully%20pleaded%2C%C2%20are%20sufficient,2d%20774%20%28CA2%201944

6. U.S. Department of Justice, Office for Access to Justice – "Advancing Equal Access to Justice for Americans with Disabilities" (Jul. 26, 2023) (blog post by Q. Naqui) – noting that despite the ADA, people with disabilities face *"particular challenges"* in legal processes and often encounter stigma from justice system actors who *"question their credibility [and] whether they deserve redress."* Highlights legal, communication, and physical barriers in courts for disabled individuals.

   https://www.justice.gov/archives/atj/blog/advancing-equal-access-justice-americans-disabilities-moving-towards-closing-justice-gap#:~:text=users%2C%20to%20courtrooms%20with%20no,for%20harms%20they%20have%20experienced

7. New York Lawyers for the Public Interest (NYLPI), *Accessible Justice: Ensuring Equal Access for People with Disabilities in NY Courts* (March 2015) – report documenting physical access barriers in courthouses. Describes how ad hoc measures (e.g. relying on freight elevators, moving furniture) *"stigmatize people with disabilities"* and force a choice between *"drawing attention to themselves or not participating at all."*

   https://www.nylpi.org/wp-content/uploads/2015/03/Accessible-Justice-NYLPI-3-23-15.pdf#:~:text=seating%20for%20wheelchairs,For%20someone%20with

Case 3:25-cv-05551-DGE   Document 32   Filed 07/08/25   Page 19 of 20

EXHIBIT A

8. Michael & Associates, "Success Rate of Representing Yourself in Court: Understanding the Odds" (May 17, 2024) – informational blog summarizing data on *pro se* outcomes. Cites a DOJ study finding only ~10% success for *pro se* immigrants vs ~40% with counsel in appeals, and a study showing 83% vs 32% success in obtaining protective orders with attorney vs self-representation.

   https://zealousadvocate.com/resources/law/representing-yourself-in-court/#:~:text=,for%20those%20who%20represented%20themselves

9. **Williams v. Mississippi**, 170 U.S. 213 (1898) – U.S. Supreme Court decision upholding Mississippi's poll tax and literacy test voter requirements, a key Jim Crow case. The Court reasoned that the laws did not *explicitly* discriminate by race and that any abuse in their administration was merely *"possible."* This case exemplified how ostensibly neutral rules were used to disenfranchise Black citizens.

   https://www.history.com/articles/jim-crow-laws-black-vote#:~:text=the%20Present%20oxford

10. Washington State General Rule 33 (adopted 2007) – court rule that permits appointment of counsel as an ADA accommodation. Washington's *Task Force on Equal Justice for People with Disabilities* emphasized that for a *pro se* person with a disability, there is *"no intermediary"* to help navigate the court, so judges and staff must be proactive, and appointment of counsel can be vital to ensure access.

    https://www.courts.wa.gov/disability-justice-task-force/public/Ensuring-Equal-Access-for-People-with-Disabilities.pdf#:~:text=intermediary%20between%20the%20court%20and,C

11. Richard Zorza, *Access to Justice*: Various writings and surveys (2011–2017) – documenting the proliferation of self-help programs and pro se assistance in courts, but also noting resistance. Some judges fear that helping *pro se* parties *"undermines the rule of law"* or diverts resources to frivolous cases, reflecting institutional reluctance that reformers must overcome.

    https://lawreview.uchicago.edu/print-archive/empirical-patterns-pro-se-litigation-federal-district-courts#:~:text=Some%20still%20remain%20skeptical%20about,63

12. **Turner v. Rogers**, 564 U.S. 431 (2011) – Supreme Court case on civil contempt and right to counsel. While the Court stopped short of requiring appointed counsel for an unrepresented father facing jail for unpaid child support, it held that Due Process mandates certain *alternative safeguards* (clear notice of the critical issues, fair opportunity to be heard, etc.) when no counsel is provided. This decision implicitly recognized the need for courts to assist *pro se* litigants to ensure fundamental fairness, though it has had limited reach beyond its facts.

EXHIBIT A

https://lawreview.uchicago.edu/print-archive/empirical-patterns-pro-se-litigation-federal-district-courts#:~:text=effectively%20foreclosing%20the%20possibility%20of,45

https://lawreview.uchicago.edu/print-archive/empirical-patterns-pro-se-litigation-federal-district-courts#:~:text=secures%20constitutional%20rights%20to%20due,49